UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRENT MELTON,

                Petitioner,                              Case Number: 11-14634
                                                                    Honorable Mark A. Goldsmith

v.

WARDEN PAUL KLEE,

                Respondent.
_____/

**OPINION & ORDER
(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (Dkt. 17),
(2) DENYING A CERTIFICATE OF APPEALABLITY. AND (3) GRANTING LEAVE
TO PROCEED IN FORMA PAUPERIS**

Petitioner Trent Melton, currently in the custody of the Michigan Department of Corrections, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his assault with intent to rob while armed conviction, Mich. Comp. Laws § 750.89. The petition raises four claims. For the reasons explained below, the Court denies the petition. The Court denies a certificate of appealability and grants Petitioner leave to proceed on appeal in forma pauperis.

**I. BACKGROUND**

Petitioner's conviction arises from the attempted robbery of Molly Runkel outside her home in Milan, Michigan. Runkel testified she lived on Barn Swallow Lane with her husband and two children. See 6/10/08 Tr. at 13-14 (Dkt. 27-3). On November 18, 2007, she arrived home from her job at a Marshalls retail store at approximately 9:00 p.m. Id. at 15. She parked her car in the driveway beside her husband's truck. Id. at 16. As she placed her foot on the pavement to exit her car, her arms were full with a pizza, lunch box, purse, and grocery bag. Id. Suddenly, a

man appeared from behind her husband's truck and pointed a gun at her face. Id. at 17. The man said, "Don't scream. If you cooperate, you'll get to go home; if you don't, I'm going to shoot or kill you." Id. The man wore a dark hoodie and a print bandana over his mouth. Id. at 18. Runkel was able to see from the middle of the man's nose to his forehead. Id. Runkel said, "Oh, my God, what do you want?" at the same time that her car alarm sounded. Id. at 19. When the alarm sounded, the man fled to a vehicle parked behind hers and drove away. Id. at 19-20. Runkel called 911 from her vehicle and the police responded to the scene. Id. at 21.

The next day, Runkel viewed a photographic lineup at the police station. She identified Petitioner from the lineup with 75% certainty. Id. at 21-22. A few days later, a police officer asked her if she knew a man by the name of Quincy Melton. She did not. Id. at 22. He then asked whether she knew a Trent Melton. Id. Runkel knew a Trent who had worked with her at Marshalls, but she had not seen him for several months. Id. at 22-23. Runkel returned to the police station and looked at the picture she had previously picked out of the lineup. Id. at 23. At that point, she recognized the person in the picture was Trent. Id. She also viewed a picture of Quincy Melton and testified that he was not the person who had assaulted her. Id. At the time of trial, Runkel had no doubt that Petitioner was the person who assaulted her. Id. at 23-24.

Milan police officer James Michael Butler testified that, on the evening of November 18, 2008, he received a radio report of an attempted robbery near where he was patrolling. Id. at 32. He noticed a vehicle matching the description provided over the radio and began following the vehicle. Id. The vehicle extinguished its lights and drove off-road through a soccer field. Id. at 33-34. Officer Butler observed the vehicle unsuccessfully attempt to ascend a steep, grass-covered hill. As the vehicle rolled backwards, he saw the driver exit the vehicle. Id. at 35. He followed the individual for a time, but eventually lost him. Approximately three hours later, Officer Butler

located Quincy Melton at a Sleep Inn and arrested him. Id. at 36. Upon his arrest, Melton stated "[I]t took three hours to find me. … That's okay, when I get out, I'm gonna --- I'll do it again." Id. at 45.

Officer Butler testified that a silver and black $CO_2$ BB gun and a wallet including an identification card for Trent Melton were recovered from the vehicle, later identified as a Chrysler Sebring. Id. at 37-38. The dashcam video from Officer Butler's squad car was played for the jury. The video player in the courtroom did not have the capability to view the video frame by frame. Officer Butler testified that he previously viewed the video frame-by-frame and could see a figure could be seen in the backseat of the vehicle. Id. at 40-41.

Lydia Tedla testified that, on November 18, 2007, at approximately 7:45 p.m., she loaned her black Chrysler Sebring to Petitioner. Id. at 69-70. He was supposed to return it that night, but he did not. Id. She received a call from Milan police later that night informing her that her vehicle had been used to commit a crime. Id. at 71-72. Petitioner appeared at her door early the next morning. Id. at 72. She told him police were looking for him. Id. He asked Tedla what he should do and she advised him to go to the police. Id. at 73.

Quincy Melton, Petitioner's brother, testified for the defense. On the evening of November 18, 2007, Quincy asked Petitioner if he could borrow Tedla's car. Id. at 89. Petitioner acquiesced. Id. Quincy and his friend Cameron (whose last name Quincy did not know) drove to Milan to buy marijuana. Id. Quincy testified that he and Cameron followed Runkel to her home. Id. at 90-91. Quincy parked the car down the street, but according to his testimony was hiding in the bushes near Runkel's driveway when she pulled in. Id. at 91. At that point, he approached the vehicle carrying a gun and wearing a bandana over his face and a hoodie. Id. at 91-92. After Runkel's car alarm sounded, Quincy ran back to the car where Cameron was waiting for him. Id. at 92.

Quincy drove away. Id. He then described being followed by a police car and, ultimately, ditching his car on a hill and fleeing on foot. Id. at 92-93.

On cross-examination, Quincy stated that he saw Runkel exiting a pizza place and followed her home from there. Id. at 101-102. In response to several questions from the court, Quincy stated that he hid in the bushes for about two minutes before Runkel pulled into her driveway. Id. at 110. He could not explain how he knew which bushes to hide in before Runkel pulled into her driveway. Id. at 110-111. He ventured that perhaps it was "just a coincidence" that he hid in bushes that ended up being beside Runkel's driveway. Id. at 111. Eventually, he testified that, the night before, he and Cameron had actually followed Runkel home when she left her job at Marshalls. Id. at 111-112. He also testified that, on the night of the incident, he and Cameron followed Runkel from her job at Marshalls. When she stopped for pizza, he and Cameron drove to her home where Quincy waited for her from behind a bush. Id. at 113-114.

Petitioner testified in his own defense. He testified that, on the evening of November 18, 2007, his brother Quincy Melton asked to borrow the car Petitioner was driving. Id. at 120-121. Quincy needed the car so that he and his friend Cameron could meet a dealer to purchase marijuana. Id. Petitioner agreed to lend Quincy the car (which had been lent to Petitioner by Lydia Tedla) if Quincy also purchased drugs for Petitioner. Id. at 121. Quincy agreed to do so. Id. After Quincy left with Cameron, Petitioner realized that he had left his cellphone and wallet in the car. Id. at 123. Petitioner expected them to return within forty minutes. Id. at 122. When they did not, he became concerned. Id. at 122, 128. He did not notify Tedla that her car was missing because he did not want to anger her. Id. at 128. The next morning, a friend drove him to Lydia Tedla's house where he learned that her vehicle had been used in a robbery. Id. at 129. Petitioner denied knowing that his brother planned to use the car to commit a robbery.

4

Following a bench trial in Monroe County Circuit Court, Petitioner was convicted of assault with intent to rob while armed. On July 31, 2008, he was sentenced as a third habitual offender to twelve to thirty years in prison.

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals. He claimed: (i) the pretrial identification procedure was impermissibly suggestive and counsel was ineffective for failing to move to suppress the identification; (ii) offense variable 14 was improperly scored; and (iii) the trial court erred in failing to correct the presentence report as agreed at sentencing. The Michigan Court of Appeals denied leave to appeal "for lack of merit in the grounds presented." See 2/5/2010 Order, People v. Melton, No. 294434 (Dkt. 27-11).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals. The Michigan Supreme Court remanded to the trial court for "the ministerial task of correcting the presentence investigation report as agreed to by the trial court" and, in all other respects, denied leave to appeal. People v. Melton, 784 N.W.2d 216 (Mich. 2010).

Petitioner then filed a habeas corpus petition and a motion to stay the petition to allow him to exhaust additional claims in state court, which the Court granted. See 4/30/2012 Op. & Order (Dkt. 7).

Petitioner filed a motion for relief from judgment in the trial court. He raised these claims for relief: (i) the prosecutor improperly presented inconsistent theories; (ii) he was denied the right to an impartial trier of fact; (iii) improper denial of right to direct appeal; (iv) trial counsel was ineffective assistance; and (v) appellate counsel was ineffective. The trial court issued a written opinion denying all of the Petitioner's claims except the ineffective assistance of trial counsel claim, regarding which the trial court scheduled an evidentiary hearing. See 7/9/2013 Opinion,

(Dkt. 27-14). Following an evidentiary hearing, the trial court denied Petitioner's ineffective assistance of counsel claims. See 12/18/2013 Tr. at Pg. ID 45-48 (Dkt. 27-9).

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals. The Michigan Court of Appeals denied leave to appeal. People v. Melton, No. 322177 (Mich. Ct. App. Sept. 15, 2014). The Michigan Supreme Court also denied leave to appeal. People v. Melton, 863 N.W.2d 57 (Mich. 2015).

Petitioner moved to reopen this proceeding and to amend his petition. The Court granted the motion and allowed amendment of the habeas corpus petition. See 2/12/2016 Opinion and Order (Dkt. 19). The habeas corpus petition raises these claims:

> I. The state court's decision that Petitioner was not denied due process and a fair trial where the pretrial identification procedure was unnecessarily suggestive and conducive to irreparable mis-identification, and that Petitioner was not deprived by the effective assistance of counsel because of trial counsel's failure to file a pre-trial motion to suppress the identification or object at trial, resulted in a decision that was contrary to U.S. Supreme Court case law.
>
> II. The state court's ruling that Petitioner was not deprived of effective assistance of counsel where trial counsel failed to have police dash cam video analyzed, was contrary to or an unreasonable application of U.S. Supreme Court case law.
>
> III. The state court's decision that the Petitioner was not denied due process and a fair trial, regarding the prosecution's use of conflicting, inconsistent, and irreconcilable theories concerning the identity of a single perpetrator to convict both Quincy Melton and Petitioner of a single act of assault with intent to commit robbery, or a specific intent crime against a single complainant, resulted in a decision that was contrary to U.S. Supreme Court case law, and, unreasonable determination of the facts in light of the evidence presented in the trial court.
>
> IV. The state court's decision that Petitioner was not denied due process and equal protection of law, where he filed a timely notice of appeal and request for appointment for an attorney to perfect his appeal of right, but he lost his appeal of right due to the trial court saying they never received such notice, resulted in a decision that was contrary to clearly established law as determined by the U.S. Supreme Court, and, an unreasonable determination of the facts in light of the evidence presented in the trial court.

Respondent filed a "Motion for Leave to File Answer Instanter" (Dkt. 25), requesting that the Court accept for filing his simultaneously filed answer in opposition to the petition (Dkt. 26). The Court finds that Respondent's failure to timely respond was the result of excusable neglect and will grant the motion and accept Respondent's answer for filing.

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v.

7

Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011).

The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102. Furthermore, pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA. See Wetzel v. Lambert, 132 S. Ct. 1195, 1199 (2012). "If this standard is difficult to meet, that is because it was meant to be." Harrington, 562 U.S. at 102. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. Id. Indeed, section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. at 102-03. A "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." Woodford v. Viscotti, 537 U.S. 19, 24 (2002). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state-court's

8

rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103. A state court's factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. Id. Moreover, for claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

### III. ANALYSIS

**A. Pretrial Identification Procedure (Claim I)**

Petitioner's first claim for relief concerns the pretrial identification procedure. He argues that the procedure was unduly suggestive and tainted the victim's in-court identification. Petitioner argues that the in-court identification should have been suppressed and defense counsel's failure to move for suppression rendered him ineffective.

Due process requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Perry v. New Hampshire, 565 U.S. 228, 238 (2012). A pretrial identification violates due process where: (1) the identification procedure is impermissibly suggestive; and (2) the suggestive procedure gives rise to a very substantial likelihood of misidentification. Neil v. Biggers, 409 U.S. 188, 197-198 (1972); Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (due process challenges to identification procedures are reviewed using Biggers' test). But the Supreme Court has held that suppression of the tainted identification is not necessarily the inevitable consequence. Brathwaite, 432 U.S. at 112-113. Instead, the Court has held that determining whether to suppress the

9

identification should be done on a case-by-case basis. Id. at 116; see also Biggers, 409 U.S. at 201.

The danger is that an initial improper identification procedure will result in misidentification and will unduly influence later investigation. U.S. v. Wade, 388 U.S. 218, 229 (1967). "[T]he dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion is the greatest." Id. Therefore, "reliability is the linchpin in determining the admissibility of identification testimony. Brathwaite, 432 U.S. at 114. A court must undertake a two-step analysis to determine the validity of a pretrial identification. First, the court must determine whether the procedure was unduly suggestive. If the court finds that the procedure was unduly suggestive, the court must then "evaluate the totality of the circumstances to determine whether the identification was nevertheless reliable." Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994). The Supreme Court has identified these factors to consider in determining whether an identification was reliable under the totality of the circumstances: "the witness's opportunity to view the criminal at the time of the crime; the witness's degree of attention at that time; the accuracy of the witness's prior description of the criminal; the witness's level of certainty at the identification; and the length of time between the crime and the identification." Erkins v. Chuvalas, 684 F. App'x 493, 496 (6th Cir. 2017) (citing Biggers, 409 U.S. 188, 200). Further, unless there is "a very substantial likelihood of irreparable misidentification," identification evidence "is for the jury to weigh." Manson v. Braithwaite, 432 U.S. 98, 116 (1977).

The Michigan Court of Appeals denied this claim "for lack of merit in the grounds presented." See People v. Melton, No. 294434 (Mich. Ct. App. Feb. 5, 2010) (Dkt. 27-11). The Michigan Court of Appeals' summary denial of Petitioner's claim, despite its brevity, is entitled

to deference under § 2254(d). Where a state court denies a claim on the merits, but without explanation, "a habeas court must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with [Supreme Court precedent]." Harrington, 562 U.S. at 102. Accordingly, the question here is whether any reasonable argument consistent with established Supreme Court law could support the state court decision summarily rejecting Petitioner's claim.

Petitioner argues that Officer Terrill's contact with Molly Runkel was unnecessarily suggestive. He claims that Runkel failed to identify him as the perpetrator in the first photo lineup and only identified Petitioner after Officer Terrill "told her that Trent Melton was the man who put the gun to her face and attempted to rob her." Am. Pet. at 9. Petitioner's argument misstates some relevant facts. First, Runkel did not fail to identify Petitioner in the first lineup; she testified that she was 75 percent certain that the person whose photograph she chose from the lineup was the perpetrator. See 6/10/2008 Tr. at 22. Second, prior to the second lineup, Officer Terrill did not identify Petitioner as the man who put the gun to Runkel's face. According to Runkel's testimony, prior to the second lineup, Officer Terrill asked her if she knew the name Quincy Melton. She said she did not. Id. He then asked her if she knew the name Trent Melton. She said that she knew a Trent who had previously worked at Marshalls, but she had not seen him for months. Id. at 22-23. Officer Terrill responded, "[U]ntil Sunday night." Id. at 23.

Officer Terrill's isolated remark, without more, is insufficient to taint the pretrial identification procedure. A pretrial line-up is not rendered impermissibly suggestive simply because a witness knows that the suspects were in custody when the lineup was conducted. See United States v. Bowman, 215 F.3d 951, 966 (9th Cir. 2000). Officer Terrill did not point Runkel

toward a particular photograph, and, she had already identified Petitioner in the previous lineup. Other than Officer Terrill's remark, Petitioner suggests, and the transcript reveals, no other concerns that would implicate the validity of the identification procedure.

Even if Officer Terrill's remark rendered the second lineup procedure unduly suggestive, the indicia of reliability outweighed any suggestiveness. The assault occurred at very close range – Runkel testified that the perpetrator held the gun about eight inches from her face. Her description of the gunman was consistent with Petitioner's appearance. She estimated the gunman to be in his late teens, early twenties. Petitioner was 19 years old at the time of the assault. Runkel estimated the suspect's height to be between 5'11" and 6'2". Petitioner is 5'11".[1] She also described the bandana the suspect wore around the bottom half of his face with particularity – a light geometric print on a dark background – demonstrating that she had the opportunity and ability to observe the perpetrator in detail. Further, Runkel identified Petitioner with 75 percent certainty from the photographic lineup which occurred <u>before</u> Officer Terrill's challenged remark and the day after the assault.[2] Runkel also testified at trial that she had no doubt that Petitioner was the person who assaulted her. Id. Under the totality of the circumstances, the Court finds that Runkel's identification of Petitioner was reliable and the Michigan Court of Appeals' decision denying this claim was not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner also argues that his trial counsel was ineffective in failing to file a motion to suppress Runkel's pretrial and in-court identification of Petitioner. Petitioner has failed to show

---

[1] The Michigan Department of Corrections' Offender Tracking Information System (OTIS) indicates that Petitioner is 5'11". The Court is permitted to take judicial notice of information on OTIS. See Ward v. Wolfenbarger, 323 F. Supp. 2d 818, 821, n.3 (E.D. Mich. 2004).

[2] At trial, Runkel testified she was 75 percent certain of her identification at the first photographic lineup. See 6/10/08 Tr. at 22. Officer Terrill testified that Runkel described herself as 70 percent certain. Id. at 54. The Court finds this slight difference insignificant.

that the identification procedure was impermissibly suggestive or that Runkel's in-court identification was not independently reliable. Petitioner therefore, fails to establish that counsel was ineffective in failing to make a pretrial motion to suppress the victim's in-court and out-of-court identifications.

### B. Ineffective Assistance of Trial Counsel (Claim II)

Police officer James Michael Butler's dash cam video recorded his pursuit of the black Sebring. The video was played for the jury. Officer Butler testified that when viewed on a device capable of viewing the video frame by frame, a second individual could be seen in the Sebring. Petitioner alleges that his attorney was ineffective in failing to have the video analyzed by an expert in digital forensic analysis. He argues that had counsel done so, the video would have shown that Quincy Melton was the sole occupant of the vehicle. Petitioner fails to show that the state court's decision denying this claim was contrary to or an unreasonable application of Supreme Court precedent.

An ineffective assistance of counsel claim has two components. Strickland v. Washington, 466 U.S. 668 (1984). A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. Id. at 687. To establish deficient representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id. at 688. In order to establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. Id. at 694.

The trial court held an evidentiary hearing on this issue. Jeff Yorkey, Petitioner's trial counsel, testified that he reviewed the videotape from Officer Butler's dash cam at the Milan Police Department. See 12/18/2013 Tr. at 20 (Dkt. 27-9). He was able to view the videotape frame by

13

frame. Yorkey testified several frames showed someone in the backseat of the Sebring. Id. at 22. The individual appeared to be a light-skinned black male. Id. Yorkey testified that he did not want to retain an expert to evaluate the videotape because he believed it would reveal information detrimental to the defense. Id. at 22-23.

The trial court found Yorkey was not ineffective in failing to retain a video expert. See id. at 47-48. The court held that, because Yorkey viewed the videotape and observed a second individual in the vehicle, he reasonably concluded that an expert would only support the prosecution's argument that Quincy and Trent Melton, worked together to assault Runkel. Id.

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. 12, 19 (2013). The standard for obtaining relief is "'difficult to meet.'" White v. Woodall, 572 U.S. 415, 419 (2014), quoting Metrish v. Lancaster, 569 U.S. 351, 358 (2013). In the context of an ineffective assistance of counsel claim under Strickland, 466 U.S. 668 (1984), the standard is "all the more difficult" because "[t]he standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Petitioner fails to overcome this doubly deferential standard of review. Petitioner argues that a report authored by Michael Plaxton, who identifies himself as a certified forensic video analyst, proves counsel was ineffective in failing to retain an expert. In the report, Plaxton

concludes that no one was seated in the backseat of the Sebring.[3] See Analysis of Digital Images, PageID.100-113 (Dkt. 17). No curriculum vitae or other evidence of Plaxton's qualifications or expertise are supplied. Even assuming Plaxton is qualified as an expert in video analysis, the report is largely based on conjecture and speculation.

Plaxton characterizes the experiment upon which he relied in preparing his report to be "not a scientifically accurate experiment." Id. at PageID.112. Plaxton isolated four consecutive frames from the video. The isolated frames revealed "an object that could be identified as a human face," but not a particular human face. Id. at PageID.101. Plaxton conducted an experiment to determine whether the "face" seen in the video could have belonged to a person seated in the back seat of the car (the location Officer Butler testified the second person was seated). Id. Plaxton could not obtain a Chrysler Sebring, so he conducted the experiment suing a Chevrolet Malibu, a vehicle of "similar proportions." Id. at PageID.112. Plaxton, who is the same height as Petitioner, apparently then attempted to assume a position in the backseat of the vehicle which would have placed his face in the same location as the face seen on the video. Plaxton "found it impossible to assume the required position." Id. Without accounting for differences in flexibility or mobility, Plaxton concluded his experiment demonstrated "the improbability that a person would be so positioned." Id. Based in part on this "improbability" and the assumption that someone in the backseat would try to hide his face from police not place it in the window, Plaxton concluded that the "alleged face" is not a face at all, but an "unfortunate combination of light and shadow on the driver's side head-red [sic] of the vehicle that gives the appearance of being a face." Id.

---

[3] It appears Petitioner presented this report in state court for the first time on appeal from the trial court's denial of his motion for relief from judgment.

15

Plaxton's report fails to show that counsel was ineffective in failing to retain an expert witness or that Petitioner suffered prejudice. First, counsel articulated a reasonable strategy for not calling an expert. Second, the expert report is wholly unpersuasive and does not offer exculpatory evidence. Third, expert testimony that the face was actually a shadow, even if it was deemed credible, would not have outweighed the evidence incriminating Petitioner, because the victim's testimony identifying him as the gunman, Petitioner's wallet was in the vehicle, and Petitioner was previously acquainted with the victim.

Petitioner has not demonstrated that counsel's strategic decision not to retain an expert was unreasonable or that he was prejudiced by counsel's decision; nor has he shown that the state court's holding that counsel was not ineffective was contrary to or an unreasonable application of Strickland. The Court, therefore, denies this claim.

**C. Inconsistent Prosecution Theories (Claim III)**

In his third claim, Petitioner argues that the prosecutor utilized inconsistent theories in obtaining convictions for Petitioner and his brother Quincy Melton. He claims that the prosecutor's theory in Quincy's case was that Quincy pointed the gun at the victim; and, in Petitioner's prosecution, that Petitioner was the gunman. Petitioner maintains that these inconsistent theories violated his right to due process.[4]

---

[4] Respondent raises a procedural default defense for this claim and Petitioner's fourth claim. **Error! Main Document Only.**The Court finds it unnecessary to address the question of procedural default. It is not a jurisdictional bar to review of the merits of an issue, Howard v. Bouchard, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," Hudson v. Jones, 351 F.3d 212, 215 (6th Cir. 2003) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)). Application of a procedural bar would not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

The trial court, the last state court to issue a reasoned opinion denying this claim, held that the prosecution did not present inconsistent theories:

> The defendant claims that the prosecution used two conflicting, inconsistent and irreconcilable theories concerning the identity of the person who actually confronted and attempted to rob the victim. However, the prosecution charged both the defendant and his brother Quincy Melton, with the commission of the crime of assault with intent to rob while armed. It was the prosecution's theory that these gentlemen were co-defendants, with one actually attempting to rob the victim and the other driving a getaway car. The only inconsistency that may have occurred is when the defendant's brother, Quincy Melton, pled guilty. During that plea proceeding, Quincy Melton claimed to have actually confronted the victim with a weapon. Thereafter, in defendant Trent Melton's trial, Quincy Melton testified in conformance with his prior guilty plea. Quincy Melton also added testimony that he was hiding in the bushes waiting for the victim to pull into her driveway but could not explain how he knew what bushes to hide in if she wasn't in her driveway yet. It should be noted that the victim, who testified that the perpetrator of the attempt to rob her at gun point was the defendant, previously had worked with the defendant. This Court thereafter found Quincy Melton's testimony to be not believable. The fact that Quincy Melton attempted to take the blame for this crime and exonerate his brother, the defendant, does not translate into the prosecutor attempting to use two conflicting, inconsistent, and irreconcilable theories concerning the identity of the person that confronted the victim during this crime.

7/9/2013 Opinion at 3-4.

The state court's holding is not unreasonable. Quincy pleaded guilty to assault with intent to rob and steal, unarmed. He admitted during the guilty plea hearing that another individual accompanied him to Runkel's home, but identified the individual as Cam, not Petitioner. Quincy's attempt to exculpate his brother was not a theory presented by the prosecution. The prosecution maintained that Petitioner and his brother acted in concert in their attempt to rob the victim. Under Michigan law, an aider and abettor is treated the same as a principal. See People v. Robinson, No. 243335, 2004 WL 103148, at *4 (Mich. Ct. App. Jan. 22, 2004). Prosecution under an aiding and abetting theory need not be separately charged. Id. It was not, therefore, inconsistent for the brothers to both be charged with assault with attempt to rob.

17

Moreover, even if the prosecutor presented inconsistent theories, relief is denied. There is no clearly established federal law supporting Petitioner's inconsistent theories claim. Bradshaw v. Stumpf, 545 U.S. 175, 190 (2005) (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."); see also Littlejohn v. Trammell, 704 F.3d 817, 852 (10th Cir. 2013) (finding no clearly established Federal law establishing that inconsistent prosecutorial theories may constitute a due process violation); Blalock v. Wilson, 320 F. App'x 396, 418 n.26 (6th Cir. 2009) (same); Dixon v. Bauman, No. 2018 WL 4078421, at *13 (E.D. Mich. Aug. 27, 2018) (same). It cannot be said that the state court's denial of this claim was contrary to, or an unreasonable application of clearly established Supreme Court precedent, where there is no clearly established federal law on this issue.

Habeas relief is denied on this claim.

**D. Appeal of Right (Claim VI)**

Under Michigan law, a defendant preserves the ability to file an appeal of right only by either filing a notice of appeal or requesting appellate counsel within 42 days of the entry of judgment. Mich. Ct. R. 7.204(A)(2)(c). In his final claim, Petitioner asserts a violation of his right to due process. Petitioner claims he requested counsel within 42 days from the entry of judgment but the trial court failed to timely appoint counsel. Consequently, Petitioner lost his appeal of right and instead had to file an application for leave to appeal (through appointed appellate counsel).

The state court held that Petitioner requested appointed counsel beyond the 42-day time limit. See 7/9/2013 Opinion at 4-5. The Court is bound by the state court's description of Petitioner's request for court-appointed counsel as untimely. Vance v. Scutt, 573 F. App'x 415, 418 (6th Cir. 2014). "Timeliness is not a simple question of fact that requires nothing more than

counting days on a calendar; rather it is a matter of state procedural law . . ." Id. A federal court must not "meddle with state court decisions on state procedural issues in habeas." Id. at 419. See also Ross v. McKee, 456 F. App'x 469, 473 (6th Cir. 2012) (declining to review Michigan Supreme Court's decision that application for leave to appeal was untimely because a federal court on habeas review "does not have the power to resolve such a claim"). Therefore, Petitioner's appeal of right was lost because of his own failure to comply with the 42-day time limit. Habeas relief is denied.

## IV. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

In this case, the Court concludes that reasonable jurists would not debate the Court's conclusion that none of the claims in the habeas petition warrant relief. Therefore, the Court denies a certificate of appealability.

## V. LEAVE TO PROCEED IN FORMA PAUPERIS

The standard for granting an application for leave to proceed in forma pauperis (IFP) is a lower standard than the standard for certificates of appealability. Foster v. Ludwick, 208 F.Supp.2d 750, 764 (E.D. Mich. 2002), citing United States v. Youngblood, 116 F.3d 1113, 1115

(5th Cir. 1997). While a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal is being taken in good faith. Id. at 764-765; 28 U.S.C. § 1915(a)(3); Fed. R. App. 24(a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. Foster, 208 F.Supp.2d at 765. The Court finds that an appeal could be taken in good faith and Petitioner may proceed in forma pauperis on appeal. Id.

## VI. CONCLUSION

For the reasons set forth above, the Court grants Respondent's Motion for Leave to File Answer Instanter (Dkt. 25).

The Court denies the petition for writ of habeas corpus, declines to issue a certificate of appealability, and grants leave to appeal in forma pauperis.

SO ORDERED.

Dated: March 22, 2019　　　　　　　　　　　　s/Mark A. Goldsmith
　　　Detroit, Michigan　　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 22, 2019.

　　　　　　　　　　　　　　　　　　　　　　　s/Karri Sandusky
　　　　　　　　　　　　　　　　　　　　　　　Case Manager